Case No. 19-7045

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

_____

## KARL FONTENOT,
*Petitioner-Appellee,*

v.

## SCOTT CROW, Director,
*Respondent-Appellant.*

_____

## BRIEF OF RESPONDENT-APPELLANT

On Appeal from the United States District Court
For the Eastern District of Oklahoma
(CIV-16-069-JHP)
The Honorable James H. Payne, United States District Judge

_____

**MIKE HUNTER**
**ATTORNEY GENERAL OF OKLAHOMA**

**MATTHEW D. HAIRE, OBA #14616**
**THEODORE M. PEEPER, OBA #19909**
**ASSISTANT ATTORNEY GENERAL**
313 NE 21st Street
Oklahoma City, OK  73105
(405) 521-3921 (Voice)/(405) 522-4534 (Fax)
Service email:   fhc.docket@oag.ok.gov

**ATTORNEYS FOR RESPONDENT-APPELLANT**

DECEMBER 31, 2019                     ORAL ARGUMENT IS REQUESTED

# TABLE OF CONTENTS

PAGE

PRIOR OR RELATED APPEALS...................................................................... 1

STATEMENT OF JURISDICTION. .................................................................. 1

ISSUES PRESENTED FOR REVIEW. .............................................................. 2

STATEMENT OF THE CASE............................................................................ 2

SUMMARY OF ARGUMENT........................................................................... 7

STANDARD OF REVIEW................................................................................. 7

BACKGROUND INFORMATION................................................................... 12

## PROPOSITION I

THE COURT ERRED BY FINDING THAT
PETITIONER OVERCAME THE STATUTE OF
LIMITATIONS, THE REQUIREMENT OF TOTAL
EXHAUSTION, AND THE PROCEDURAL BAR OF
*LACHES*, BASED ON A SHOWING OF CAUSE
AND PREJUDICE AND ACTUAL INNOCENCE. ....................... 16

"Alibi" Evidence....................................................................................... 23

Alleged Harassment of Haraway by an Unknown Man. ................................... 29

Eyewitness Identification "Recantation"........................................................ 31

Fraud on the Court. .................................................................................. 38

The district court's finding of actual innocence was also error......................... 40

ii

## PROPOSITION II

**HAVING ERRED BY PROCEEDING TO THE MERITS OF PETITIONER'S CLAIMS, THE DISTRICT COURT FURTHER ERRED WHEN IT FAILED TO ACCORD AEDPA DEFERENCE TO THE DECISION OF THE STATE COURT AND GRANTED RELIEF ON EVERY CLAIM.** ..................................... 46

**CONCLUSION.** ........................................................................... 55

**STATEMENT REGARDING ORAL ARGUMENT.** ......................................... 55

**CERTIFICATE OF COMPLIANCE.** .................................................. 57

**CERTIFICATE OF SERVICE.** ........................................................ 57

**CERTIFICATE OF DIGITAL SUBMISSIONS.** ................................................ 58

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Bousley v. United States*,
  523 U.S. 614 (1998) ........................................................................44

*Bradshaw v. Richey*,
  546 U.S. 74 (2005) ...........................................................................51

*Brady v. Maryland*,
  373 U.S. 83 (1963) .................................................................. Passim

*Bruton v. United States*,
  391 U.S. 123 (1968) .........................................................................53

*Bryant v. Dowling*,
  No. 17-CV-468-CVE-JFJ, 2019 WL 3304812 (N.D. Okla. Jul. 23, 2019) ......47

*Burger v. Scott*,
  317 F.3d 1133 (10th Cir. 2003) ....................................................7, 16

*Burt v. Titlow*,
  571 U.S. 12 (2013) ...........................................................................10

*Carriger v. Stewart*,
  132 F.3d 463 (9th Cir. 1997) ..........................................................32

*Case v. Hatch*,
  731 F.3d 1015 (10th Cir. 2013) .......................................................32

*Coleman v. Thompson*,
  501 U.S. 722 (1991) .........................................................................20

*Cullen v. Pinholster*,
  563 U.S. 170 (2011) ................................................................ Passim

*Davila v. Davis*,
  _ U.S. _, 137 S. Ct. 2058 (2017) .....................................................18

*Davis v. Ayala*,
   567 U.S. \_, 135 S. Ct. 2187 (2015) ...................................................................10

*Davis v. Executive Dir. of Dep't of Corr.*,
   100 F.3d 750 (10th Cir. 1996) .......................................................................7

*Davis v. Workman*,
   695 F.3d 1060 (10th Cir. 2012) ....................................................................11

*Delozier v. Sirmons*,
   531 F.3d 1306 (10th Cir. 2008) ....................................................................53

*Demarest v. Price*,
   130 F.3d 922 (10th Cir. 1997) ......................................................................46

*Doe v. Jones*,
   762 F.3d 1174 (10th Cir. 2014) ............................................................... 18, 42

*Eaton v. Pacheco*,
   931 F.3d 1009 (10th Cir. 2019) ............................................................... 11, 48

*Fairchild v. Workman*,
   579 F.3d 1134 (10th Cir. 2009) ............................................................... 16, 24

*Farrar v. Raemisch*,
   924 F.3d 1126 (10th Cir. 2019) .....................................................................8

*Fisher v. Gibson*,
   262 F.3d 1135 (10th Cir. 2001) ....................................................................17

*Fleming v. Evans*,
   481 F.3d 1249 (10th Cir. 2007) ....................................................................22

*Frost v. Pryor*,
   749 F.3d 1212 (10th Cir. 2014) ................................................... 10, 28, 43, 44

*Fry v. Pliler*,
   551 U.S. 112 (2007) ......................................................................................9

*Gardner v. Galetka*,
   568 F.3d 862 (10th Cir. 2009) ...................................................... 12, 48

*Gilbert v. Scott*,
   941 F.2d 1065 (10th Cir. 1991) .............................................................43

*Gipson v. Jordan*,
   376 F.3d 1193 (10th Cir. 2004) ...............................................................8

*Hain v. Gibson*,
   287 F.3d 1224 (10th Cir. 2002) .............................................................48

*Hamilton v. Mullin*,
   436 F.3d 1181 (10th Cir. 2006) ..................................................... Passim

*Hancock v. Trammell*,
   798 F.3d 1002 (10th Cir. 2015) ...............................................................9

*Harrington v. Richter*,
   562 U.S. 86 (2011) ................................................................... 9, 10, 48

*Harris v. Kuba*,
   486 F.3d 1010 (7th Cir. 2007) ....................................................... 23, 24

*House v. Bell*,
   547 U.S. 518 (2006) ...............................................................................43

*In re Davis*,
   565 F.3d 810 (11th Cir. 2009) ...............................................................32

*Jackson v. Virginia*,
   443 U.S. 307 (1979) ...............................................................................50

*Jackson v. Virginia*,
   447 U.S. 307 (1979) .................................................................................9

*Lockhart v. Nelson*,
   488 U.S. 33 (1988) .................................................................................51

*Lowe v. Bear*,
    No. CIV-17-406-JHP-KEW, 2019 WL 1756283 (E.D. Okla. Apr. 19, 2019)
    ................................................................................................................47

*Maples v. Thomas*,
    565 U.S. 266 (2012) ...................................................... 19, 21

*McDaniel v. Brown*,
    558 U.S. 120 (2010) ................................................................51

*McQuiggin v. Perkins*,
    569 U.S. 383 (2013) ............................................... 41, 42, 43

*Mitchell v. Gibson*,
    262 F.3d 1036 (10th Cir. 2001) ............................................8

*Murray v. Carrier*,
    477 U.S. 478 (1986) ..............................................................19

*Pennsylvania v. Finley*,
    481 U.S. 551 (1990) ..............................................................22

*Romano v. Gibson*,
    278 F.3d 1145 (10th Cir. 2002) ..........................................53

*Rose v. Lundy*,
    455 U.S. 509 (1982) ..............................................................18

*Schlup v. Delo*,
    513 U.S. 298 (1995) ............................................... 41, 42, 43

*Smith v. Addison*,
    No. 09-5147, 373 Fed. Appx. 886 (10th Cir. Apr. 20, 2010)...........................18

*Smith v. Workman*,
    904 F.3d 874 (10th Cir. 2018) ............................................11

*Strickland v. Washington*,
    466 U.S. 668 (1984) ............................................... Passim

*Strickler v. Greene*,
   527 U.S. 263 (1999) ................................................................... **Passim**

*United States v. Lee*,
   399 F.3d 864 (7th Cir. 2005) .............................................................**24**

*Virginia v. LeBlanc*,
   582 U.S. _, 137 S. Ct. 1726 (2017) ...................................................**10**

*Williams v. Taylor*,
   529 U.S. 362 (2000) ...........................................................................**9**

*Wood v. Allen*,
   558 U.S. 290 (2010) ...........................................................................**10**

*Woodward v. Williams*,
   263 F.3d 1135 (10th Cir. 2001) ......................................................**8, 16**

## STATE CASES

*Carmichael v. Beller*,
   914 P.2d 1051 (Okla. 1996) ..............................................................**21**

*Fisher v. State*,
   736 P.2d 1003 (Okla. Crim. App. 1987) ............................................**26**

*Fontenot v. State*,
   742 P.2d 31 (Okla. Crim. App. 1987) ............................................**2, 13**

*Fontenot v. State*,
   881 P.2d 69 (Okla. Crim. App. 1994) ......................................... **Passim**

*Jones v. State*,
   704 P.2d 1138 (Okla. Crim. App. 1985) ............................................**19**

*McElmurry v. State*,
   60 P.3d 4 (Okla. Crim. App. 2002) ...................................................**49**

*Ward v. State*,
   755 P.2d 123 (Okla. Crim. App. 1988) ..............................................**12**

## STATUTES

**28 U.S.C. § 2244(d)**...................................................................**7**

**28 U.S.C. § 2244(d)(1)**.............................................................**17**

**28 U.S.C. § 2244(d)(1)(D)**.......................................................**42**

**28 U.S.C. § 2253**......................................................................**1**

**28 U.S.C. § 2254**..................................................................**7, 13**

**28 U.S.C. § 2254(d)**.............................................................**8, 11**

**28 U.S.C. § 2254(d)(1)**........................................................**11, 39**

**28 U.S.C. § 2254(d)(1-2)**.......................................................**9, 55**

**28 U.S.C. § 2254(d)(2)**...........................................................**10**

**28 U.S.C. § 2254(e)(1)**.................................................... **Passim**

**28 U.S.C. § 2254(e)(2)**...........................................................**28**

## RULES

**10th Cir. R. 28(A)(2)**..............................................................**1**

**10th Cir. R. 32.1**.............................................................. **18, 47**

**Fed. R. App. P. 32.1**........................................................ **18, 47**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

| | | |
|---|---|---|
| KARL FONTENOT, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No.   19-7045 |
| vs. | ) | |
| | ) | Eastern District of Oklahoma |
| SCOTT CROW, Director, | ) | No. CIV-16-069-JHP |
| | ) | |
| Respondent-Appellant. | ) | |

## BRIEF OF RESPONDENT/APPELLANT

## PRIOR OR RELATED APPEALS

There are no prior or related appeals.

## STATEMENT OF JURISDICTION

On August 21, 2019, the United States District Court for the Eastern District of Oklahoma entered an Opinion and Order in favor of Petitioner and against Respondent (ROA, Vol.XXXI, 857-1046).[1]   A judgment was entered against Respondent on August 27, 2019 (ROA, Vol.XXXI, 1047).  Respondent filed his Notice of Appeal to this Court on September 13, 2019 (ROA, Vol.XXXI, 1048-1049).  The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 2253.

---

[1] The parties have designated the record on appeal.  Therefore, pursuant to 10th Cir. R. 28(A)(2), the record on appeal will be referred to as (ROA, Vol. _).  The trial transcript will be referred to as (N/T mm/dd/yyyy, ). The preliminary hearing transcript will be cited (P/H Tr. [vol.] _).

## ISSUES PRESENTED FOR REVIEW

1.  Whether the District Court erred by finding that Petitioner overcame the statute of limitations, the requirement of total exhaustion, as well as the state's procedural bar, based on a showing of cause and prejudice and actual innocence.

2.  Whether the District Court further erred by proceeding to the merits of Petitioner's barred claims without according AEDPA deference to the state court's decision, and erred in granting relief on every claim.

## STATEMENT OF THE CASE

On April 28, 1984, Petitioner and his co-defendant Tommy Ward kidnapped Donna Haraway from McAnally's convenience store in Ada and thereafter murdered her.  On October 19, 1984, following his arrest, Petitioner confessed to the crimes in a videotaped statement.  *Fontenot v. State*, 881 P.2d 69, 75 (Okla. Crim. App. 1994).

In 1985, the co-defendants were tried together in Pontotoc County District Court Case No. CRF-1984-183.  Both co-defendants were convicted of first degree murder and sentenced to death.  Thereafter, the Oklahoma Court of Criminal Appeals ("OCCA"), reversed Petitioner's conviction, holding that the erroneous admission of the co-defendant's statement was not harmless.  *Fontenot v. State*, 742 P.2d 31, 32 (Okla. Crim. App. 1987).

2

Petitioner was retried in Hughes County District Court Case No. CRF-1988-43, after a change of venue. He was again convicted of first degree murder and sentenced to death. He was also again convicted of robbery with a dangerous weapon, and kidnapping, and was sentenced to ten and twenty years, respectively. *Fontenot*, 881 P.2d at 73-74.

On June 8, 1994, the OCCA affirmed Petitioner's convictions and non-capital sentences, while remanding his death sentence for resentencing because the trial judge had not followed the State's request to instruct the jury on the sentencing option of Life Without Parole. *Fontenot*, 881 P.2d at 86. Relevant to this habeas proceeding, Petitioner challenged the voluntariness of his confession, the corroboration of his confession, the sufficiency of the evidence, and the effectiveness of his counsel. The OCCA found that Petitioner's confession to murder was voluntary and corroborated in nine separate ways. *Fontenot*, 881 P.2d at 78-79.

The resentencing trial never took place because on September 18, 1995, Petitioner entered into a negotiated settlement in which he waived his right to jury re-sentencing in exchange for the prosecutor's recommendation of a sentence of Life Without Parole (ROA, Vol.XXXI, 317-333).

Petitioner's one year statute of limitations to file a petition for writ of habeas corpus expired under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), on April 25, 1997.

Sixteen years later, on July 24, 2013, Petitioner filed an Application for Post-Conviction Relief in Pontotoc County, followed by an Amended Brief in Support of Application for Post-Conviction Relief (ROA, Vol.XXXI, 334-432). The State answered Petitioner's post-conviction application (ROA, Vol.XXXI, 433-576). On December 31, 2014, following Petitioner's filing of a motion for summary judgment, his post-conviction application was denied by the state district court (ROA, Vol.XXXI, 674-675).

Petitioner appealed the denial of post-conviction relief to the OCCA, in OCCA Case No. PC-2015-76 (ROA, Vol.XXXI, 676-710). On October 29, 2015, the OCCA entered an Order Granting Motion to Associate Counsel and Affirming Denial of Post-Conviction Relief (ROA, Vol.XXXI, 711-715).

On February 24, 2016, Petitioner filed his petition for writ of habeas corpus in the District Court for the Eastern District of Oklahoma (ROA Vol.I, 20-172). Petitioner was subsequently allowed to amend his habeas petition twice, ultimately filing his *Second Amended Petition for Writ of Habeas Corpus* on March 15, 2019 (ROA, Vol.XXX, 17-190).

Petitioner's second amended petition was based on approximately 300 pages of documents which were produced in response to a subpoena in state court from Petitioner's co-defendant, as well as a federal subpoena from Petitioner, which was filed under seal. Respondent did not object to Petitioner's being allowed to file his second amended petition. Nevertheless, Petitioner filed a *Motion for Sanctions, Leave to Amend Petition for Writ of Habeas Corpus and Request for a Hearing* seeking a protective order against several entities, bond for Petitioner, and the removal of the procedural bars previously asserted by Respondent (ROA, Vol.XXIX, 800-811).

On April 9, 2019, a hearing was held on Petitioner's sanctions motion, with the Honorable Magistrate Judge Steven P. Shreder presiding. The Magistrate entered an order preserving any records relating to the subject matter of this proceeding in the possession of the Ada Police Department or the Ada City Attorney. The Magistrate correctly reasoned that Petitioner was already previously allowed to amend his habeas petition. The second amended petition was already on file.

However, the Magistrate denied other sanctions requested by Petitioner, including Petitioner's request that the *laches* defense or any other defenses asserted be waived, finding that such issues went to the merits of the petition. He found such sanctions were not appropriate given the absence of any prejudice to

5

Petitioner, in light of the fact the records were produced to Petitioner and Petitioner was allowed to amend his petition (ROA, Vol.XXXI, 66-67).

On April 29, 2019, Respondent filed his *Motion to Dismiss Second Amended Habeas Corpus Petition as Procedurally Barred by the Statute of Limitations and the State Bar of Laches, and Because It Includes Unexhausted Claims* and supporting brief (ROA, Vol.XXXI, 211-212; 213-316).

In spite of the Magistrate's proper decision not to remove Respondent's asserted defenses, the Court, with the Honorable James H. Payne, United States District Judge, presiding, filed an Opinion and Order on August 21, 2019, which not only found those asserted defenses to be overcome through a showing of factual innocence and cause and prejudice, but also, without ordering further response, proceeded to find merit with each and every one of Petitioner's propositions (ROA, Vol.XXXI, 857-1046). The Court granted a conditional writ, noting that the petition was granted and would issue, "unless within one hundred twenty (120) days of the entry of this Order the State grants Petitioner a new trial or, in the alternative, orders his permanent release from custody." (ROA, Vol.XXXI, 1046). A separate Judgment was issued on August 27, 2019 (ROA, Vol.XXXI, 1047).[2]

---

[2] By Order of November 4, 2019, this Court stayed the Judgment to the extent it ordered the re-trial must take place within 120 days. On December 19, 2019, Petitioner was released from the custody of the Department of Corrections, pending the outcome of this

## SUMMARY OF THE ARGUMENT

The District Court erred by finding that Petitioner overcame the one year statute of limitations under AEDPA, the state's procedural bar of *laches*, and his failure to exhaust all of his claims, based on a finding of a *Brady*[3] violation and actual innocence.

The Court further erred by proceeding to directly address the merits of Petitioner's claims without granting Respondent the opportunity to file a merits response, resulting in the Court not applying the correct standard of review under AEDPA, which cannot be waived, and thereby failing to accord deference to the state court's decision on direct appeal.  The Court also erred in granting relief on every claim in the petition.

## STANDARD OF REVIEW

Petitioner brought this action pursuant to 28 U.S.C. § 2254.  Regarding the Court's findings on the procedural issues involved in this case, including the application of the time bar pursuant to 28 U.S.C. § 2244(d), this Court will review the lower court's findings of fact for clear error and its conclusions of law *de novo*. *Davis v. Executive Dir. of Dep't of Corr.,* 100 F.3d 750, 756 (10th Cir. 1996). However, this Court will review the Court's decision on the question of equitable tolling of the limitation period for an abuse of discretion.  *Burger v. Scott*, 317 F.3d

appeal.
[3] *See Brady v. Maryland*, 373 U.S. 83 (1963).

1133, 1137-1138 (10th Cir. 2003); *Woodward v. Williams*, 263 F.3d 1135, 1142 (10th Cir. 2001).

Because the Court reached the merits of the underlying issues, including the voluntariness of Petitioner's confession and the sufficiency of the evidence, the AEDPA provides the governing standard of review for many of the issues raised in the second amended petition. *Mitchell v. Gibson*, 262 F.3d 1036, 1045 (10th Cir. 2001). *See Farrar v. Raemisch*, 924 F.3d 1126, 1130 (10th Cir. 2019) ("In habeas cases, we engage in de novo review of the district court's legal ruling . . . . When applying de novo review, however, we must consider the applicability of statutory deference under 28 U.S.C. § 2254(d)"); *Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004) (reasoning that the AEDPA's deferential standard of review applies when the OCCA denies a claim on the merits; "a state court reaches a decision 'on the merits' even when it fails either to mention the federal basis for the claim or cite any state or federal law in support of its conclusion"). Under AEDPA, a petition for writ of habeas corpus will not be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

8

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1-2).

The Supreme Court and this Court have recognized, "Section 2254(d) provides 'preconditions to the grant of habeas relief . . ., not an entitlement to it.'" *Hancock v. Trammell*, 798 F.3d 1002, 1010 (10th Cir. 2015) (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)). The Supreme Court has explained:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-413 (2000).

The Supreme Court elaborated on this standard of review again in *Harrington v. Richter*, 562 U.S. 86 (2011), wherein the Court reasoned, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Richter*, 562 U.S. at 102-103 (quoting *Jackson v. Virginia*, 447 U.S. 307, 332 n.5 (1979)). The Supreme Court further reasoned that

"[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (internal quotation marks omitted). Therefore, the standard set by the AEDPA was designed to be "difficult to meet." *Richter*, 562 U.S. at 102. *See also Burt v. Titlow*, 571 U.S. 12, 20 (2013) ("We will not lightly conclude that a State's criminal justice system has experienced the 'extreme malfunctio[n]' for which federal habeas relief is the remedy."); *Frost v. Pryor*, 749 F.3d 1212, 1222-1223 (10th Cir. 2014) ("We may 'issue the writ' only when the petitioner shows 'there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'" (citing *Richter*, 562 U.S. at 102) (emphasis and alterations added by the *Frost* Court)). *See Virginia v. LeBlanc*, 582 U.S. _, 137 S. Ct. 1726, 1729 (2017) ("A proper respect for AEDPA's high bar for habeas relief avoids unnecessarily 'disturb[ing] the State's significant interest in repose for concluded litigation . . . .'").

Likewise, under 28 U.S.C. § 2254(d)(2), the federal court must give deference to the state court's factual findings, which are presumed to be correct. *Davis v. Ayala*, 567 U.S. _, 135 S. Ct. 2187, 2199-2200 (2015). *See Wood v. Allen*, 558 U.S. 290, 301 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a

different conclusion in the first instance.").   Therefore, a state prisoner seeking federal habeas relief based upon alleged erroneous factual determinations must overcome by clear and convincing evidence the presumption afforded state court factual findings.  28 U.S.C. § 2254(e)(1); *Hamilton v. Mullin*, 436 F.3d 1181, 1186 (10th Cir. 2006).  The petitioner must overcome AEDPA's limitations based upon the state record alone.  *See Cullen v. Pinholster*, 563 U.S. 170, 181-182 (2011) (§ 2254(d)(1)'s "backward-looking language ["resulted in" and "involved"] requires an examination of the state-court decision at the time it was made," therefore, "the record under review is limited to the record in existence at that same time-*i.e.*, the record before the state court."); *Smith v. Workman*, 904 F.3d 874, 886 (10th Cir. 2018) (reasoning, so long as Section 2254(d)'s disallowance of relief continues to apply, courts cannot consider any evidence developed in federal court); *Davis v. Workman*, 695 F.3d 1060, 1067 (10th Cir. 2012) ("AEDPA requires deference to the state court's findings of fact.  We presume those findings to be correct, and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  (citing 28 U.S.C. § 2254(e)(1))).

The highly deferential demand of 28 U.S.C. § 2254(d) may never be cast aside, for it comprises a standard of review that cannot be waived, nor may it be ignored – particularly when a state court has already decided an issue on the merits.  *See Eaton v. Pacheco*, 931 F.3d 1009, 1014-16 and n.7 (10th Cir. 2019);

*Gardner v. Galetka*, 568 F.3d 862, 879 (10th Cir. 2009) ("[T]he correct standard of review under AEDPA is not waivable. It is, unlike exhaustion, an unavoidable legal question we must ask, and answer, in every case.").

## BACKGROUND INFORMATION

From the beginning, the Court treated Petitioner's federal habeas corpus petition differently than it would treat any other federal habeas corpus petition. That repeated special treatment resulted in an Opinion and Order which ignored proper standards of review and the deference owed to state court decisions.

The Opinion initially claimed that Petitioner's "case is one of three the United States District Court for the Eastern District of Oklahoma has found to involve a dream confession of dubious validity," citing co-defendant Ward's direct appeal, *Ward v. State*, 755 P.2d 123 (Okla. Crim. App. 1988) (ROA, Vol XXXI, 857 and n.2). This begs the question since co-defendant Ward's collateral proceedings are in a different procedural posture. Ward is currently seeking post-conviction relief in state court, and has never filed a federal habeas corpus petition as of the time of this writing. Therefore, the Eastern District has had no opportunity to rule on the validity of Ward's confession and it should have made no predetermination concerning it.[4]

---

[4] Nevertheless, the Opinion stopped short of exonerating co-defendant Ward, as it recognized that, subsequently to his confession, Ward made a major admission against penal interest (ROA, Vol.XXXI, 982-983) (citing ROA, Vol.XXVI, 63-101).

The Opinion's finding regarding a case not before it was only the beginning of its legal errors. The Court ostensibly recognized that a federal court in a proceeding under 28 U.S.C. § 2254 must defer to factual findings made in the state courts; and those facts "are entitled to a presumption of correctness," unless those facts are rebutted by clear and convincing evidence (ROA, Vol.XXXI, 866 and n.4) (citing 28 U.S.C. § 2254(e)(1)). However, while the Court made reference to the 1987 opinion, the appeal of Petitioner's first trial, with its citation to *Fontenot*, 742 P.2d at 32, the opinion never makes reference to any *findings* in the OCCA's 1994 opinion, even when determining that Petitioner's confession was invalid or in determining that the evidence of Petitioner's guilt was insufficient. Beyond bare references while setting out the procedural history, a discussion of the 1994 opinion is absent from the Opinion and Order.

The 1994 opinion was of utmost importance because it set forth nine separate ways in which Petitioner's confession was corroborated. *Fontenot*, 881 P.2d at 78-86. Some of that corroborating evidence included the fact that Petitioner and Ward were known to ride around in a gray-primered truck such as the one used in the crime. The failure of the Opinion and Order to give proper deference to the OCCA's opinion is a fatal flaw which requires reversal of the Court's Judgment. That this error followed the Court's premature, *ex parte* decision allowing Petitioner to gather and introduce a plethora of evidence which

was never presented to the state courts on direct appeal or post-conviction review only compounded the seriousness of the error.

It appears that the Court's many aberrations from AEDPA's requirements stemmed from a belief that *Brady* violations occurred and that Petitioner was factually innocent. However, Petitioner's *Brady* claims could have been raised on collateral review long before he filed his first application for post-conviction relief. While Petitioner's second direct appeal was pending, he received "860 pages" of OSBI documents after the OCCA granted Petitioner's Motion to Produce Documents and Things in the Possession, Custody or Control of the Oklahoma State Bureau of Investigation ("OSBI") for inspection and copying, on December 1, 1992 (ROA, Vol.XXXI, 716-717; 718-719). Furthermore, Petitioner conceded during his state post-conviction proceedings that his appellate counsel took custody of this material (ROA, Vol.XXXI, 601-602).

Likewise, the Medical Examiner's report was long available to Petitioner. The 2013 affidavit from Terry Hull (Petitioner's appellate counsel on his original direct appeal) proffered by Petitioner claimed that she did not see portions of the Medical Examiner's report (ROA, Vol.XXXI, 727-730). She claimed to be unaware that the report was forty-three pages long (ROA, Vol.XXXI, 730). However, the contemporaneous notes taken by Dr. Balding in 1986 and other correspondence from that time indicate that Ms. Hull not only saw the entire file,

but that she took notes about it and personally visited with Dr. Balding about the issues and conclusions which were drawn in Petitioner's case (ROA, Vol.XXXI, 721-726).  Specifically, Dr. Balding wrote that Ms. Hull "looked thru [sic] the case" (ROA, Vol.XXXI, 726).  Thus, the record refutes the Court's finding that parts of the Medical Examiner's file, including the anthropology reports, were not disclosed.  Instead, this appears to be a case of faulty memory on the part of Petitioner's counsel, which is not surprising given the passage of three decades.

A handful of additional documents have been released by the OSBI and the Ada Police Department in the time since Petitioner initiated his collateral proceedings.  Most particularly, Petitioner has focused on the approximately 300 pages of additional documents that were released by the Ada Police Department to Petitioner in early 2019.  It appears that these documents were simply overlooked during the search pursuant to Petitioner's 2017 federal subpoena.  Petitioner has placed great emphasis on these documents, particularly a letter which Petitioner drafted to his counsel, George Butner, before preliminary hearing but apparently never mailed to him.  Petitioner alleges this would have supported his alibi defense.  However, as will be set forth herein, this information was cumulative, as it was within Petitioner's own knowledge, and Petitioner was not prevented from informing his trial counsel about it as he acknowledged talking to his trial counsel "nearly daily" (ROA, Vol.XXXI, 312).

In finding that Petitioner overcame the procedural, exhaustion, and time bars through some type of ongoing *Brady* violation, the Court failed to understand that, "not every new piece of evidence makes a claim a new one." *Fairchild v. Workman*, 579 F.3d 1134, 1148 (10th Cir. 2009). Petitioner could have raised all his claims decades ago. He failed to do so. Moreover, in finding that Petitioner was actually innocent due to an uncorroborated confession, the Court flatly ignored the OCCA's solid findings to the contrary.

## PROPOSITION I

**THE COURT ERRED BY FINDING THAT PETITIONER OVERCAME THE STATUTE OF LIMITATIONS, THE REQUIREMENT OF TOTAL EXHAUSTION, AND THE PROCEDURAL BAR OF *LACHES*, BASED ON A SHOWING OF CAUSE AND PREJUDICE AND ACTUAL INNOCENCE.**

The Court abused its discretion by finding that Petitioner overcame the statute of limitations under AEDPA, the requirement of total exhaustion, and the state's procedural bar of *laches*, based on a finding of cause and prejudice and a fundamental miscarriage of justice. *Burger*, 317 F.3d at 1137-1138; *Woodward*, 263 F.3d at 1142.

The AEDPA generally affords state prisoners one year during which they must file a Petition for Writ of Habeas Corpus. Section 2244(d) of Title 28 of the United States Code provides: "A 1-year period of limitations shall apply to an

application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court."

The Court should have held this petition, filed in 2016, was time-barred by the statute of limitations because Petitioner filed it long after April 24, 1997. "Where a conviction became final before AEDPA took effect, as is the case with Fisher, the one year limitation period for a federal habeas petition starts on AEDPA's effective date, April 24, 1996." *Fisher v. Gibson*, 262 F.3d 1135, 1142 (10th Cir. 2001). The petition was also filed more than one year following "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of reasonable diligence." 28 U.S.C. § 2244(d)(1).

The Court also should have held that the petition was barred under the state court's procedural bar of *laches*. After the state district court found that Petitioner's petition should be denied on the basis of *laches*, the OCCA affirmed that decision on the basis of its own established precedent (ROA, Vol.XXXI, 713-714).

Petitioner did not really challenge the independence or adequacy of the state's imposition of the procedural bar of *laches*, instead alleging that a showing of cause and prejudice and actual innocence overcame all bars. Nevertheless, this Court has previously found Oklahoma's bar of *laches* to be an adequate state law

ground that is independent of federal law.  In *Smith v. Addison*, No. 09-5147, 373 Fed. Appx. 886, 888 (10th Cir. Apr. 20, 2010) (unpublished),[5] then-Judge Gorsuch held that Oklahoma's bar of laches is adequate and independent.  *See Doe v. Jones*, 762 F.3d 1174, 1183 (10th Cir. 2014) ("With respect to the possibility that a laches determination could be a procedural bar as an adequate and independent state ground for dismissal of the post-conviction application, this is a hurdle petitioner would have to overcome whether or not a stay is granted.").

The Court erred when it concluded that Petitioner overcame these formidable bars to the consideration of the merits, based on Petitioner's long inaction, under both the cause and prejudice and actual innocence exceptions (ROA, Vol.XXXI, 868).  For the same reasons, the Court erred in granting relief on a "mixed" petition, which included Petitioner's unexhausted ineffective assistance of appellate counsel claim and issues stemming from the approximately 300 pages of material released by the Ada Police Department in early 2019 (ROA, Vol.XXXI, 298-315).  "The exhaustion requirement is designed to avoid the 'unseemly' result of a federal court 'upset[ting] a state court conviction without' first according the state courts an 'opportunity to . . . correct a constitutional violation."  *Davila v. Davis*, _ U.S. _, 137 S. Ct. 2058, 2064 (2017) (quoting *Rose v. Lundy*, 455 U.S. 509, 518 (1982)).  By excusing the exhaustion requirement on

---

[5] Unpublished decision cited for persuasive value only, pursuant to Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

the basis of alleged futility (ROA, Vol.XXXI, 905), the District Court showed no regard for the "unseeml[iness]" of that result.  Moreover, the District Court ignored the fact that the OCCA allows claims to be presented on a second post-conviction application when there is good cause shown.  *Jones v. State*, 704 P.2d 1138, 1140 (Okla. Crim. App. 1985).

First, the Court erred when it held that Petitioner showed cause and prejudice based on alleged *Brady* violations (ROA, Vol.XXXI, 918-974).   To establish "cause" to excuse a procedurally defaulted claim, a habeas petitioner must show that "some objective factor external to the defense impeded . . . [his] efforts to comply with the state procedural rules." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  The "cause" for procedural default must therefore be an act or omission that cannot be attributable to Petitioner.  Thus, to satisfy this requirement for overcoming the procedural and time bars, Petitioner was required to demonstrate that some force untraceable to himself prevented him from filing his application for post-conviction relief sooner.  Petitioner was also required to prove "actual prejudice resulting from the error of which he complains." *Carrier*, 477 U.S. at 488.  Thus, to overcome the bars by showing "cause and prejudice," Petitioner was required to demonstrate that a constitutional violation completely outside his control is what kept him – for over two decades – from raising his claims in a timely manner in state court.  *Maples v. Thomas*, 565 U.S. 266, 280

(2012) ("Cause for a procedural default exists where 'something *external* to the petitioner, something that cannot fairly be attributed to him[,] . . . impeded [his] efforts to comply with the State's procedural rule.'" (quoting *Coleman v. Thompson*, 501 U.S. 722, 753 (1991))); *Coleman*, 501 U.S. at 750 ("prejudice" requires a showing of "actual prejudice as a result of the alleged violation of federal law").

The Court relied on an alleged "failure to disclose . . . records and . . . resistance to disclosing the remainder of the outstanding evidence" which it held resulted in a Fourteenth Amendment Due Process violation (ROA, Vol.XXXI, 973-974).  This finding ignored that much of the material upon which Petitioner based his *Brady* and actual innocence claims was available to Petitioner since 1992 (ROA, Vol.XXXI, 716-717).  Because these claims had their genesis in the OSBI material released in 1992, Petitioner could have initiated his collateral proceedings at that time, notwithstanding any additional information he has obtained through discovery on collateral review.  Therefore, contrary to the Court's conclusion, Petitioner failed to demonstrate "cause" because he was responsible for not only the long delay in his claims being raised, but also any further development of those allegations in the state court.

Moreover, discovery was not "ongoing" in state court when the court denied Petitioner's post-conviction application (ROA, Vol.XXXI, 872).  That finding is

belied by the procedural history of this case.  Through the filing of a motion for summary judgment in the state district court, Petitioner formally informed the state post-conviction court that the proof he needed to establish his claims was complete at that time and in no need of further development, investigation, or hearing (ROA, Vol.XXXI, 577-607).  Contrary to the Court's finding, the state court absolutely ruled on Petitioner's motion for summary judgment; it simply ruled against the moving party (ROA, Vol.XXXI, 674) ("IS AN EVIDENTIARY HEARING NECESSARY?  No.  (Petitioner having stipulated to have decision heard on briefs and motions and responses.)").  *See Carmichael v. Beller*, 914 P.2d 1051, 1053 (Okla. 1996) ("Although a trial court in making a decision on whether summary judgment is appropriate considers factual matters, the ultimate decision turns on purely legal determinations, i.e. whether one party is entitled to judgment as a matter of law because there are no material disputed factual questions.").  Petitioner was therefore totally responsible for, or at least greatly contributed to, the lack of further factual development and/or discovery in state court before that court imposed the *laches* bar.  Thus, to the extent the Court found Petitioner established cause for his procedural defaults because state actors deprived him of the opportunity to fully develop his federal claims – including his "actual innocence" gateway claim – before barring them by *laches*, the Court erred because this was not a factor external to Petitioner.  *Maples*, 565 U.S. at 280.

As Respondent noted in the Court below, the question of whether Petitioner ever properly exhausted *Brady* as his "cause" to overcome the procedural bars in state court is problematic.  Petitioner did raise a *Brady* claim on post-conviction (ROA, Vol.XXXI, 356-392).  However, Petitioner relied on a different "cause" to overcome the *laches* bar in state court, namely, a conflict of interest with Petitioner's *post-conviction* counsel (ROA, Vol.XXXI, 654-655).[6]

Petitioner also failed to demonstrate prejudice.  Thus, the Court erred when it held that the allegedly withheld material created a reasonable probability of a different result at trial.  The Supreme Court has held, "There are three components of a true *Brady* violation.  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999).   In *Strickler*, the Supreme Court found that "cause and prejudice" paralleled two of the three components of the alleged *Brady* violation itself in that the suppression of certain documents was one of the causes for failing to assert a *Brady* claim in the state courts.   However, the Court reasoned, "unless those documents were 'material' for *Brady* purposes, their suppression did not give rise to sufficient

---

[6] *But see Pennsylvania v. Finley*, 481 U.S. 551, 555 (1990) (there is no general constitutional right to post-conviction counsel); *Fleming v. Evans*, 481 F.3d 1249, 1255 (10th Cir. 2007) (same).

prejudice to overcome the procedural default." *Strickler*, 527 U.S. at 282.  It concluded that although the petitioner had shown cause, he had not shown a reasonable probability that his conviction or sentence would have been different had the materials been disclosed and therefore, he could not show materiality under *Brady* or prejudice from his failure to raise the claim earlier.  *Strickler*, 527 U.S. at 296.  Notably, this "reasonable probability" language is essentially the same as the prejudice prong of *Strickland v. Washington*, 466 U.S. 668 (1984).

The Court erred in finding that Petitioner showed materiality or prejudice within the meaning of *Brady* and *Strickler* to overcome the procedural bar, lack of total exhaustion, and the time bar, as shown below.

**"Alibi" Evidence**

The Court erred when it held that Petitioner showed a reasonable probability of a different outcome within the meaning of *Brady* and *Strickler* based on alleged withholding of evidence related to a party which Petitioner allegedly attended on the night of the murder.  This evidence was not suppressed.  First, because evidence of Petitioner's alibi would have been within Petitioner's own knowledge, it can reasonably be said that Petitioner always knew where he was on the night the victim was abducted and killed.  Information from the prosecution has never been required to investigate or substantiate that fact, and Petitioner could have provided this information to his counsel at any time during the representation.  *See Harris v.*

*Kuba*, 486 F.3d 1010, 1015 (7th Cir. 2007) (reasoning that evidence is suppressed only if the evidence was not otherwise available to the defendant through the exercise of due diligence and "Harris knew where he was (and was not) at the time" and therefore, "Harris's own alibi was not concealed from him and is therefore not properly a claim under *Brady*."); *United States v. Lee*, 399 F.3d 864, 865 (7th Cir. 2005) (reasoning that *Brady* deals with the concealment of exculpatory evidence unknown to the defendant and because "Lee was aware of his own pants," the claim was not properly one under *Brady*).

Second, Petitioner could have made this claim in 1992, as it was based on 860 pages of documents that he received then (ROA Vol.V, 21-140; ROA, Vol.VI, 166-327). Nevertheless, Petitioner alleged that the police department's possession of a letter he wrote to "George" (Butner) prevented him from developing his alibi until 2019, and the Court apparently accepted Petitioner's assertion that it was improperly intercepted.[7] *But see Fairchild*, 579 F.3d at 1148 (emphasizing that "not every new piece of evidence makes a claim a new one"). If Petitioner truly had an alibi, it is unbelievable that he would have mentioned it once, in a single letter to counsel, and then never again. Accordingly, assuming *arguendo* this letter was intercepted, such did not affect Petitioner's ability to raise an alibi defense at trial, or in his post-conviction application.

---

[7] In fact, the Magistrate made no such finding regarding the letter or other material following the sanctions hearing.

Contrary to the Court's conclusion of "newly discovered" evidence, the notion of a party was always present in this case, as it was mentioned in Petitioner's confession and at preliminary hearing.  The prosecutorial itself contained a reference to the party, as Petitioner admitted (ROA, Vol.XXX, 81) (citing ROA, Vol.IV, 324 (prosecutorial bates 142)).  Petitioner has never claimed that his counsel lacked access to the prosecutorial, as it is undisputed this was always available to the defense, even prior to trial.  Moreover, it is undisputed that Mr. Butner represented Petitioner all along, from preliminary hearing through the re-trial in 1988.  Therefore, Petitioner had ample opportunity over the course of several years to present evidence of his alleged alibi to his defense counsel; as previously noted, Petitioner acknowledged talking to his trial counsel "nearly daily" (ROA, Vol.XXXI, 312).  Petitioner acknowledged in his confession that he and Ward were at a party (P/H Tr. III 664).  Furthermore, Detective Dennis Smith testified that Petitioner told him:  "Okay, I'm telling you the truth this time.  Me and Tommy were at a party on South Townsend . . . we met a guy named Odell Titsworth and we left with him and went riding around" (P/H Tr. V 969).

As this was information that would have been within Petitioner's knowledge at the time of his trial, Petitioner cannot realistically claim that this information was suppressed by the State within the meaning of *Brady* and *Strickler*, and the Court erred when it concluded the information was suppressed.

Further, the Court should have found Petitioner failed to show a reasonable probability of a different outcome at trial if he had presented evidence regarding this party. *Strickler*, 527 U.S. at 296. The party in question occurred within the same town where the victim was abducted, and it would not be "miraculous" as Petitioner has claimed for Petitioner to have attended the party but also to have committed the crimes (ROA, Vol.XXX, 66 n.22). Ward was allegedly at this same party, yet the Opinion and Order quotes a lengthy admission that Ward made under oath, acknowledging he was present at the time Haraway left the convenience store (ROA, Vol.XXXI, 982-983) (citing ROA, Vol.XXVI, 63-101). Moreover, the opinion acknowledges that witnesses saw Mr. Ward at J.P.'s or McAnally's (N/T 6/8/1988, 20-21, 27). Therefore, Petitioner has not shown materiality under *Brady* or prejudice with respect to his alibi claim stemming from any alleged withholding of *Brady* material. *Strickler*, 527 U.S. at 296. *Compare Fisher v. State*, 736 P.2d 1003, 1008 (Okla. Crim. App. 1987) ("Appellant's own bald assertions are woefully inadequate to establish that, at the very time of the offense, he was so far away that he could not have participated in its commission."). Further, this evidence does not rise to the exceptional standard for actual innocence.

The Court even credited a theory of alibi regarding the victim's supposed pregnancy (ROA, Vol.XXXI, 902-904).[8] Petitioner theorized that because she

---

[8] The Court found that this portion of the report had been withheld from the defense, but

allegedly gave birth during the period of time she was missing and by the time he was already incarcerated, he was innocent of her murder. The Court, rather than viewing this claim based on a radically different timeline of the victim's death with some skepticism, instead found merit to this theory, finding it "impossible" for Petitioner to have killed her under this circumstance (ROA, Vol.XXXI, 903). The Court relied on two lines of an anthropology report showing "[m]arks on the pelvis" that "indicated she had given birth to at least one child[,]" a 1978 article about the subject, and hearsay (ROA, Vol.XXIII, 48; Vol.XXXI, 902-904).

Respondent rebutted this, and even exposed Petitioner's own concession that the alleged birth could never be proven due to the lapse of time (ROA, Vol.XXX, 60-62).[9] Despite the weaknesses in Petitioner's *Brady* and "actual innocence" claims, the Court determined Haraway's alleged pregnancy to be a "startling revelation . . . undermin[ing] the state's entire theory as to the motive of Mrs. Haraway's kidnapping and what happened to her in the months leading up to her death." (ROA, Vol.XXXI, 903). Petitioner presented no affidavit from anyone who actually saw the pelvis, or proof from a relative, or anything else indicating that this mere *what-if theory* actually had validity. These are the types of

---

that finding is contradicted by the existing factual record, as the District Court ordered the release of the medical examiner information in March 1986, and Dr. Balding wrote that Ms. Hull "looked thru [sic] the case" (ROA, Vol.XXVI, 59-60; Vol.XXXI, 726).

[9] Indeed, the alleged fetal birth is contravened by the missing person's report, which indicated the victim was not pregnant (ROA, Vol.XXIII, 65).

unreliable and untrustworthy "facts" which the Court concluded were "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Frost*, 749 F.3d at 1231-1232. If the Court were going to rely on such a controversial theory in finding actual innocence, it should have at least subjected it to the rigors of adversarial testing through cross-examination.[10]

While this particular example of the Court's rationale for finding cause and prejudice and actual innocence may seem particularly outlandish, it is no different than all the other erroneous findings of fact made by the Court in one key respect. The Court showed no interest in testing the theory further before simply accepting it out of whole cloth. While it would have been more reasonable to hear directly from people who actually knew Haraway before arriving at the conclusion she was pregnant at the time of her abduction rather than relying on hearsay and two lines of a report, the Court in early 2018 decided there would be no evidentiary hearing held regarding this habeas petition. While that decision would have made sense if the Court were inclined to uphold the procedural bars or dismiss without prejudice in order to allow Petitioner to further exhaust state remedies,[11] it made no sense

---

[10] Regardless of any notches that may have been observed on Haraway's pelvis, Petitioner's theory means that someone had to abduct the victim in April, hold her captive until at least October, and only then was she killed, after having given birth.

[11] Respondent opposed an evidentiary hearing based upon AEDPA principles including exhaustion and the requirements of 28 U.S.C. § 2254(e)(2) (ROA, Vol.XXIX, 58-70).

when the Court decided to overrule the bars and proceed to the merits of the claims, especially given the deference that was owed to the state court opinion.  28 U.S.C. § 2254(e)(1); *Hamilton*, 436 F.3d at 1186.  The findings of the state court included the fact the confession was voluntary and corroborated.

However, with the slight exception of the hearing on Petitioner's motion for sanctions, and the narrow issues involved therein, the Court never wavered from the decision not to hold a hearing.  This type of frail, untested proof helped Petitioner overcome his procedural bars in the eyes of the Court.

**Alleged Harassment of Haraway by an Unknown Man**

The Court abused its discretion by finding a material violation of *Brady* based on the claim that Haraway was being harassed by someone at work.  In addition to the fact this basic information was known before Petitioner's re-trial, Petitioner has never discounted the possibility that he and/or his co-defendant could have been responsible for the harassing phone calls.

As discussed in the State's Response to Petitioner's Application for Post-Conviction Relief, Petitioner's trial counsel was aware before Petitioner's second jury trial that the victim received disturbing phone calls at McAnally's; he was also aware that the victim expressed a desire to obtain a gun.  In Petitioner's Exhibit 22,

---

However, at the time Respondent was unaware of all the *ex parte* rulings concerning discovery, and therefore could not refute Petitioner's "new" evidence.  Under these circumstances, the Court's acceptance of all the allegations without ordering an evidentiary hearing was a manifest injustice.

counsel's investigator reported to Mr. Butner concerning an interview with Anthony Johnson:

> Johnson admitted . . . that one week before Harraway's [sic] disappearance, he was in McAnaly's [sic] convenience store when Harraway [sic] asked him where she could buy a gun. Harraway [sic] referenced the need for a gun with some funny phone calls she had recently been receiving. Haraway said she didn't really know who was making the calls, and that the caller never really said anything, just did some heavy breathing.

(ROA, Vol.II, 260). This report is dated May 19, 1988, prior to Petitioner's 1988 jury trial. The statement James Watts provided to Lloyd Bond, on July 25, 1985, added nothing to what defense counsel learned from his investigator. Mr. Watts was the victim's co-worker. He reported she had received some upsetting phone calls but they had stopped one month before she disappeared (ROA, Vol.XXVI, 207). Furthermore, Darlene Adams' 2013 affidavit does not add any weight to this claim, portraying as it does the victim's general "uneas[iness]" of working at the store. The affidavit reveals that Ms. Adams was simply a customer at McAnally's who occasionally talked to the victim. This is nothing different than what Anthony Johnson related to the defense back in 1988 (ROA, Vol.II, 25-26).

Therefore, because the "funny phone calls" were known to defense counsel, it cannot be said that this evidence was suppressed, nor is it newly discovered for purposes of Petitioner's "actual innocence" claim since, like Petitioner's alibi, it was available to the defense since the 1980s. Moreover, Petitioner has not shown

that if Watts and Adams and other witnesses testified about the victim getting obscene calls, it would have created a reasonable probability that his verdict would have been different.  Clearly this anonymous evidence, which was incapable of exculpating anyone, would not have exculpated two co-defendants who both confessed to rape and murder.  *Strickler*, 527 U.S. at 296.  Therefore, Petitioner failed to show the existence of a material *Brady* violation with respect to this claim, and the Court erred in so finding.

**Eyewitness Identification "Recantation"**

Petitioner alleged below that the only eyewitness who identified him recanted the identification.  As part of a consistent, problematic pattern, the Court appeared to greatly credit this assertion, without subjecting the alleged "recantation" obtained by Petitioner's investigators to adversarial testing. Petitioner claimed, "From his first interviews with the Ada police to his testimony at the preliminary hearing and trial, he [Jim Moyer] was not consistent."  (ROA, Vol.XXX, 47).

Although this witness testified at Petitioner's preliminary hearing that Petitioner was the man with Ward at J.P.'s, he was decidedly less sure of that identification at Petitioner's trial.  According to Petitioner, Moyer later "clarified his position" regarding his identification **during state post-conviction proceedings**, and this amounts to a recantation that makes a difference in his case

(ROA, Vol.XXX, 50).   Contrary to the conclusion of the Court, the witness's recantation during the post-conviction process is not *Brady* material, nor is it newly discovered.

As this Court cautioned in *Case v. Hatch*, "recanted testimony is notoriously unreliable, 'easy to find but difficult to confirm or refute:  witnesses forget, witnesses disappear, witnesses with personal motives change their stories many times, before and after trial.'" *Case v. Hatch*, 731 F.3d 1015, 1044 (10th Cir. 2013) (citing *Carriger v. Stewart*, 132 F.3d 463, 483 (9th Cir. 1997) and *In re Davis*, 565 F.3d 810, 825 (11th Cir. 2009)).   The *Davis* Court, cited by this Court, reasoned: "[W]e repeatedly have noted that recantations are viewed with extreme suspicion by the courts . . . because . . . recantation testimony upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction." *Davis*, 565 F.3d at 825.   That unreliability is illustrated here.

The problem with claiming that this is *Brady*, or newly discovered, material is that Moyer's "uncertainty" in his identification of Petitioner was on full display at the 1988 trial.  Moyer admitted he was "confused" about the second man he saw with Ward after seeing Petitioner during the preliminary hearing (N/T 6/9/1988, 25).  Defense counsel elicited from Moyer, just as Moyer states in his affidavit,

that this uncertainty prompted him to call the District Attorney's office to report his concern (N/T 6/9/1988, 25-26). Mr. Moyer's uncertainty at trial caused the District Attorney, Bill Peterson, to have to point out during closing argument that Mr. Moyer became unsure of Mr. Fontenot's identification, and he explained that to the jury (N/T 6/14/1988, 21). Mr. Moyer's testimony was nevertheless helpful in that he described men generally matching Petitioner's and Ward's descriptions within the store, and that they drove an old, gray-primered pickup.

The OCCA found these consistent descriptions to be one of the nine ways in which Fontenot's confession was corroborated. *Fontenot*, 881 P.2d at 78-86. Instead of giving the proper deference to such points of corroboration, the Court erred by determining that Petitioner's confession was not corroborated. Without so much as acknowledging the OCCA's holding on direct appeal, which should have been a formidable obstacle to obtaining habeas relief, the Court instead found "numerous and substantial indicia of unreliability . . . ." (ROA, Vol.XXXI, 1002). However, it failed to address the nine separate points of corroboration found by the OCCA. A state prisoner seeking federal habeas relief based upon alleged erroneous factual determinations must overcome by clear and convincing evidence the presumption afforded such state court factual findings. 28 U.S.C. § 2254(e)(1); *Hamilton*, 436 F.3d at 1186. How can it be said that the OCCA's factual findings were overcome when the Court failed to even address them?

The nine separate points of corroboration found by the OCCA were as follows:

First, the OCCA found it significant that Petitioner made two extrajudicial, post-crime statements in addition to his confession. He told a friend [Gordon Calhoun] that he knew facts about the Haraway abduction–specifically the perpetrator's identity. And while he was awaiting trial in the county jail, a fellow inmate [Leonard Martin] overheard him saying, "I knew we'd get caught." *Fontenot*, 881 P.2d at 78 (N/T 6/8/1988, 145-146; N/T 6/10/1988, 205).

Second, the Court found that three witnesses [David Timmons, Linny Timmons, Gene Whelchel] saw Haraway leaving the convenience store with a man on the day she disappeared. They saw the man take her to an old, gray-primered Chevy pick-up, which Petitioner described. They saw her enter from the passenger side with the man following, as Petitioner described. *Fontenot*, 881 P.2d at 78.

Third, an insurance agent [Wayne Gridner] testified he insured a gray-primered Chevy for its owner, Ward's brother [Joel Ward]. A witness who knew both co-defendants [J.T. McConnell] testified they were friends and he saw them riding around together in the Chevy pickup. *Fontenot*, 881 P.2d at 78.

Fourth, one witness [Jim Moyer] who entered McAnally's just before the abduction testified that he saw two men generally matching Fontenot's and Ward's descriptions inside the store. The two men were driving an old, gray-primered

pickup.  One of them acted as if he wanted the witness to leave.  *Fontenot*, 881 P.2d at 78.  Note that the OCCA did not say that Moyer identified Petitioner, but he did provide a description matching Petitioner.  As previously discussed, that has not changed, in spite of Moyer's different accounts over time.  If the Court wanted to hold that Moyer's changing accounts rendered this one point of corroboration invalid, it should have at least subjected Moyer's claims to the rigors of cross-examination rather than relying on affidavits produced by defense investigators.  Without taking that step, the OCCA's finding that Moyer's testimony represented one of nine points of corroboration was not overcome by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Hamilton*, 436 F.3d at 1186.

Fifth, another witness [Karen Wise] who worked just 1/4 mile down the road at another convenience store testified about having seen two men matching Ward and Fontenot's descriptions in her store earlier on the evening of the abduction. She described the truck they drove as red and gray-primered.  They were watching her and she felt uncomfortable.  They left around 8:30 or 9:00 p.m. and headed towards McAnally's.  *Fontenot*, 881 P.2d at 78.  Once again, if the Court wanted to find that the OCCA's factual finding was overcome through clear and convincing evidence, it should have subjected Wise's recantation, discussed below, to the rigors of adversarial testing rather than just accepting a defense-produced affidavit at face value.  28 U.S.C. § 2254(e)(1); *Hamilton*, 436 F.3d at 1186.

Sixth, the manager of McAnally's [Monroe Atkinson] testified that $167 was taken from the store. Petitioner stated in his confession that they took about $150 during the robbery. *Fontenot*, 881 P.2d at 79.

Seventh, the blouse Haraway wore on the evening of her abduction buttoned up the front and had lace around the collar and cuffs. Petitioner said in his confession that she wore a blouse with ruffles around the sleeves and elastic in the sleeves. *Fontenot*, 881 P.2d at 79.

Eighth, the shoes found with Haraway's remains were soft-soled, canvas shoes. Her husband characterized these shoes as "tennis" shoes. However, Petitioner gave a more accurate description of the shoes, specifically describing them as "soft-soled" shoes and stating they were not tennis shoes. The OCCA found it significant that "[d]uring oral argument . . . [Petitioner's] appellate counsel stated that information about Haraway's shoes had not been made public prior to his confession." *Fontenot*, 881 P.2d at 79 and n.12.

Ninth and most generally, there was considerable testimony describing Haraway's life: her somewhat recent marriage to Steve Haraway; her eager anticipation of a teaching degree; her overall happiness and contentment; and her dedication to her job responsibilities. This corroborated Petitioner's statement that she did not willingly leave McAnally's but was abducted. *Fontenot*, 881 P.2d at 79.

While the Court did not acknowledge these points of corroboration, it appears to have placed great weight on the alleged "recantation" of Karen Wise in finding that Petitioner's confession was not corroborated.  Ms. Wise testified at Petitioner's 1988 trial she was not sure whom she saw while working at J.P.'s, and could not make any positive identification (N/T 6/8/1988, 177).  On habeas, Petitioner presented evidence from Ms. Wise that was substantially the same, only stronger in that she now claimed to be nearly positive she did not see Petitioner (ROA, Vol.XXX, 51-53).  As with Mr. Moyer's "recantation" this "new" evidence was not suppressed, is not newly discovered, and is unreliable so many years after the fact.  Nevertheless, Petitioner's jury heard an unsure witness at trial, but the Court did not even acknowledge this testimony or the fact that Petitioner was convicted in spite of Ms. Wise's failure to positively identify Petitioner.

Another erroneous finding by the District Court fitting within this category was the District Court's reliance on alleged impeachment evidence concerning jailhouse informant Terri Holland, which he claims was withheld and should have been made available to impeach Holland's testimony at preliminary hearing and the joint trial.  The Court discusses how she could have been impeached based on the benefits she received but completely glosses over the fact she did not testify at the only trial that matters:  Petitioner's re-trial in 1988 (ROA, Vol.XXXI, 960-964).  Thus, there can be no finding of a material *Brady* violation based on Ms. Holland.

**Fraud on the Court**

The Court also made a finding of "fraud on the court" because of Respondent's alleged failure to correct Ada's erroneous response to Petitioner's 2017 subpoena. This finding was an abuse of discretion, and to the extent it contributed to the Court's conclusion that Petitioner showed cause and prejudice due to a *Brady* violation, that finding was also an abuse of discretion.

This finding was erroneous for two reasons. First, it ignored the findings of the Magistrate at the April 9, 2019, hearing. The Magistrate denied nearly all of the sanctions requested by Petitioner, including Petitioner's request that the *laches* defense or any other defenses asserted by Respondent be waived, finding that such issues went to the merits of the petition. The Magistrate found such sanctions were not appropriate because Petitioner showed no prejudice, in light of the fact the records were produced and Petitioner was promptly allowed to amend his petition (ROA, Vol.XXXI, 66).

Second, the Court ignored the dubious way in which Petitioner obtained discovery in federal court in the first place. As Respondent has only come to learn through designating the record in this appeal, the decision to grant Petitioner discovery was done under seal, and was deliberately done in an *ex parte* manner, without notice to Respondent. Indeed, Petitioner blatantly asked the Court to cut Respondent out of the discovery process, thus preventing any ability to file a

responsive pleading to Petitioner's requests for discovery, and the record shows that the District Court made factual findings against Respondent in this *ex parte* manner (ROA, Vol.I, 421; 422; 423-432; 433).

This Court should be concerned that Respondent was never allowed to argue in opposition to the granting of discovery in the District Court, particularly given the "backward-looking language" of Section 2254(d)(1) as acknowledged by the Supreme Court, which ordinarily demands that habeas corpus review be limited to the state court record. *See Cullen*, 563 U.S. at 182.  By seeking discovery orders *ex parte*, Petitioner clearly signaled to the Court that he did not want or need Respondent's help in the discovery process but then blamed Respondent when an issue came up in discovery.

At a minimum, Petitioner's counsel or the Court should have acknowledged the existence of these *ex parte* discovery orders to Respondent so that Respondent could have used the manner in which they were obtained in defending against Petitioner's sanctions motion against Respondent and in defending against Petitioner's claims under AEDPA and *Cullen*.  *But see* ROA, Vol.I, 422 ("Plaintiff need not provide notice to the respondent of this motion or order due to its ex parte nature.").

Despite the fact Respondent was forced to defend against Petitioner's motion without access to this crucial information, the Magistrate made the right call in not

sanctioning Respondent and by not removing the AEDPA time bar and the bar of *laches*.   After hearing evidence that the police department had recently moved buildings, the Magistrate correctly recognized that the primary responsibility for the failure to produce records responsive to the Petitioner's subpoena did not lie with Respondent and further recognized that Respondent had produced the records to Petitioner (ROA, Vol.XXXI, 66).   Respondent relied on the Magistrate's findings preserving the procedural bars in filing a motion to dismiss Petitioner's second amended habeas petition.   However, it appears that in finding a "fraud on the court" the District Court simply ignored the conclusions of its own Magistrate that fault did not lie with Respondent.   That decision, in turn, appears to have infected the Court's conclusion that Petitioner showed "cause and prejudice."

As such, the Court's finding that Petitioner overcame the formidable bars to his habeas petition through showing a *Brady* violation was an abuse of discretion.

**The district court's finding of actual innocence was also error.**

In addition to finding that Petitioner overcame his procedural bars through a showing of cause and prejudice based on a *Brady* violation, the Court concluded that Petitioner overcame the procedural bars based on his "probable innocence." (ROA, Vol.XXXI, 858, 877).   This was also an abuse of the Court's discretion. The actual innocence exception is intended to be exceptionally rare, the most difficult showing for a petitioner to make.

Petitioner pointed blame in multiple directions throughout his habeas proceedings below, but his petitions lacked a unifying theory for why this Court or anyone should believe that some other individual committed the crime. The habeas petition failed to coalesce around any one person or group of perpetrators as the likely murderer. While Petitioner threw suspicion at certain individuals like Floyd Degraw, or an unidentified man seen in McAnally's thirty minutes before the kidnapping, or even people in Beaumont, Texas, Petitioner offered the Court nothing but several inconsistent theories, in spite of receiving an unprecedented amount of discovery in his collateral proceedings, both in state court and federal court.

The Supreme Court has held that claims which are time-barred under the AEDPA may nonetheless be reviewed by a habeas court upon a credible showing of "actual innocence." *McQuiggin v. Perkins*, 569 U.S. 383, 390-394 (2013). While the *Perkins* Court held that a petitioner alleging actual innocence to overcome the time bar is not absolutely required to show diligence, nevertheless, the Court explained that timing is an important factor in assessing the *credibility* of a petitioner's claim, reasoning:

> Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing . . . . As we stated in *Schlup*, "[a] court may consider how the timing of the submission and the likely credibility of [a petitioner's] affiants bear on the probable reliability of . . . evidence [of actual innocence].

*Perkins*, 569 U.S. at 399 (citing *Schlup v. Delo*, 513 U.S. 298, 327, 332 (1995)) (alterations in the original).  Applying *Perkins*, this Court has refused to shield petitioners from the consideration of diligence with respect to the reliability of actual innocence claims.  *Doe*, 762 F.3d at 1183.

Nevertheless, the Court apparently gave no weight to Petitioner's lack of diligence in pursuing collateral relief, thus committing the same error that the Sixth Circuit was found to have committed in *Perkins*.  Instead of placing weight on Petitioner's delay, the Court noted a lack of evidence "that [Petitioner] personally knew" of that was provided to the Oklahoma Indigent Defense System in 1992 (ROA, Vol.XXXI, 870).  The Court also excused Petitioner from any delay because he was allegedly mentally unstable, and because his *post-conviction* counsel allegedly took some of his records (ROA, Vol.XXXI, 870-871).  That is not the law.  The AEDPA informs a habeas petitioner that a petition must be brought within one year from "the date on which the factual predicate of the claim or claims presented *could have been discovered* through the exercise of reasonable diligence."  28 U.S.C. § 2244(d)(1)(D) (emphasis added).  Furthermore, these alleged facts, even if true, do not excuse the inordinate length of the delay in this case.  Here, Petitioner had access to virtually all of the material at issue in 1992, but waited decades while memories faded, possible witnesses died, and documents were misplaced or lost to time before seeking collateral relief.  Pursuant to *Perkins*,

Petitioner's claim that he is actually innocent is highly doubtful in light of this unexplained delay.

Furthermore, as both *Schlup* and *Perkins* make clear, "[c]ases involving a fundamental miscarriage of justice 'are extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime.'" *Gilbert v. Scott*, 941 F.2d 1065, 1068 n.2 (10th Cir. 1991) (internal quotations omitted).

In *Schlup*, the case primarily relied upon by Petitioner, the Supreme Court held that "to be credible [a claim of actual innocence requires] new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence . . . ." *Schlup*, 513 U.S. at 324.  Petitioner must present "'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" *Perkins*, 569 U.S. at 400 (quoting *Schlup*, 513 U.S. at 316).  "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Schlup*, 513 U.S. at 324; *see also House v. Bell*, 547 U.S. 518, 538 (2006) (reasoning, "[t]he *Schlup* standard is demanding and permits review only in the 'extraordinary case'").

In *Frost*, this Court explained the demanding standard a petitioner must meet to demonstrate actual innocence:

> To make a credible showing of actual innocence, a "petitioner must 'support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial.'" This new evidence "must be sufficient to 'show that it is more likely than not that no reasonable juror would have convicted the petitioner in the light of the new evidence.'" This standard is "demanding and permits review only in the extraordinary case."

*Frost*, 749 F.3d at 1231-32 (internal citations omitted). *See also Bousley v. United States*, 523 U.S. 614, 623 (1998) (explaining that "actual innocence" must be based upon new evidence of "factual innocence, not mere legal insufficiency").

In this case, the Court abused its discretion by finding that Petitioner met this strenuous burden of showing "new" or "reliable" evidence to overcome the time bar, procedural bar, and the requirement of total exhaustion. As explained, Petitioner received the "860 pages" of OSBI documents in 1992 (ROA, Vol.XXXI, 716-717). Petitioner largely relied on this decades-old material in support of his allegations.

Petitioner apparently believed, mistakenly, that all evidence is new, no matter how that evidence related to his trial or when Petitioner's defense team could reasonably have gained access to it. As explained, the evidence cited by Petitioner below fell into four rough categories: the "860 pages" of OSBI documents turned over in 1992; the Medical Examiner's Report/File (which

Petitioner had in 1986); evidence regarding alternate suspects (none of which was not reasonably discoverable earlier); and evidence obtained from the Ada Police Department (which is largely cumulative of other evidence including the evidence available to Petitioner concerning his alibi). Oddly, Petitioner even sought to support his "actual innocence" gateway claim with *testimony* from his previous trial proceedings and affidavits from witnesses who testified during his 1988 trial.

Petitioner's second amended petition attempted some minimal reliance on the Ada Police reports produced in 2019 in support of his actual innocence proposition (ROA, Vol.XXX, 47) ("From his first interviews with the Ada police to his testimony at the preliminary hearing and trial, he [Mr. Moyer] was not consistent"); (ROA, Vol.XXX, 48) ("Not only was the sequence of events from the men in the store different from his testimony, but he was not shown [Petitioner's] photo spread. As the prosecution relied upon him [Moyer] to put [Petitioner] in the store, it is interesting that he was not asked to identify him during his interview. Mr. Moyer's account of his time in McAnally [sic] is widely inconsistent from his original interview, through his preliminary hearing and trial testimony."); (ROA, Vol.XXX, 56) ("As in Mr. Moyer's testimony, Ms. Wise's police report varies in details that would have aided a jury in assessing whether these people were talking about the same truck."). However, just as Respondent showed above that there was no *Brady* violation based upon these police reports, given their lack of

materiality in light of the testimony which the jury actually heard from Moyer and Wise, Petitioner also cannot meet the narrow, actual innocence exception based upon these old police reports.

Petitioner has not made a colorable showing of actual innocence based on any of this material, whether considered separately or cumulatively. *Demarest v. Price*, 130 F.3d at 922, 941-42 (10th Cir. 1997). Petitioner's various theories are so contradictory (at times suggesting the victim was not kidnapped, or gave birth to a child, or did not even meet with foul play) they do nothing to undermine his corroborated confession.

For the foregoing reasons, the Court abused its discretion in determining that Petitioner met the exceptionally rare, actual innocence exception, based on a finding that Petitioner's confession was uncorroborated when the OCCA found the exact opposite, and its decision must be reversed.

## **PROPOSITION II**

**HAVING ERRED BY PROCEEDING TO THE MERITS OF PETITIONER'S CLAIMS, THE DISTRICT COURT FURTHER ERRED WHEN IT FAILED TO ACCORD AEDPA DEFERENCE TO THE DECISION OF THE STATE COURT AND GRANTED RELIEF ON EVERY CLAIM.**

Rather than following the traditional procedure of allowing Respondent to file a merits response after denying a procedural motion to dismiss, the Court denied the motion and proceeded directly to the merits of Petitioner's claims in one

Opinion and Order, without further opportunity for response by Respondent, relying on Rule 5(a) of the Rules Governing Section 2254 Cases. Respondent respectfully submits that his filing of a motion to dismiss should not be deemed a waiver of his right to respond to the allegations of the petition, as Respondent acted in reliance on established procedure. The Eastern District Court routinely entertains such motions to dismiss without requiring a merits response from Respondent. *See, e.g., Lowe v. Bear*, No. CIV-17-406-JHP-KEW, 2019 WL 1756283 (E.D. Okla. Apr. 19, 2019)[12] (unpublished) (granting motion to dismiss petition for writ of habeas corpus). Other federal courts in Oklahoma are in accord. *See, e.g., Bryant v. Dowling*, No. 17-CV-468-CVE-JFJ, 2019 WL 3304812 (N.D. Okla. Jul. 23, 2019) (unpublished) ("For the reasons that follow, the Court denies respondent's motion to dismiss the amended petition as time-barred and directs respondent to file an answer responding to the allegations in the amended petition."). Whatever the Court's reason for circumventing the established habeas corpus procedure, it led the Court to commit a demonstrable legal error, which undermined the validity of all the Court's subsequent merits determinations. Namely, the Court failed to accord the proper deference to the OCCA's opinion on direct appeal. *See Fontenot v. State*, 881 P.2d 69 (Okla. Crim. App. 1994).

---

[12] Unpublished decisions are cited for their persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

Indeed, the proper standard of review can never be waived when a state court has decided an issue on the merits. *See Eaton*, 931 F.3d at 1014-16 and n.7; *Gardner*, 568 F.3d at 879 ("[T]he correct standard of review under AEDPA is not waivable."). Thus, even if the Court was determined not to allow Respondent to respond on the merits after denying Respondent's procedural motion, the Court was still obligated to apply AEDPA correctly. The Court, however, deferred to none of the state court's findings of fact or conclusions of law. Only if a claim was not decided on the merits by the state court, and is not otherwise procedurally barred, may the federal court exercise its independent judgment in deciding the claim in the way this Court did. *Hain v. Gibson*, 287 F.3d 1224, 1229 (10th Cir. 2002). *See Richter*, 562 U.S. at 102 ("Here it is not apparent how the Court of Appeals' analysis would have been any different without AEDPA").

Because the Court failed to accord proper deference under AEDPA, even to issues which were decided on their merits in Petitioner's direct appeal, the Court found merit with *every* argument raised by Petitioner.

As previously set forth, perhaps the greatest error in the Opinion and Order occurred with respect to the way in which Petitioner's confession was reviewed. Contrary to the OCCA's conclusions that the confession was both voluntary and corroborated, the Court determined Petitioner's confession was involuntary and unreliable, that he was "fed" facts, that his alleged mental disabilities were

exploited, and that there was "absolutely no evidence" corroborating the confession (ROA, Vol.XXXI, 994-1022).[13]    Having made these erroneous findings, the Court heavily relied upon the alleged invalidity of the confession in determining that the evidence against Petitioner was insufficient.

The Court erred by determining that Petitioner's confession was involuntary on the basis of Petitioner's own *ipse dixit* in the form of self-serving recantations and such evidence as Dr. Richard Leo's "review[]" of the evidence in which he concluded, "In my professional opinion, Karl Fontenot's confession statement is almost certainly, if not certainly, false." (ROA, Vol.XXXI, 1002). Once again, the State had no opportunity to probe such conclusions, and any such evidence not presented to the OCCA on direct appeal should not have been considered. *See Cullen*, 563 U.S. at 181-182. Like Petitioner's incredible theories that the victim gave birth sometime between her kidnapping and her murder, or that the victim left willingly with her abductors, the Court once again just accepted whatever Petitioner asserted. The Court also determined Petitioner's confession to be involuntary without considering his repeated incriminating admissions while in jail that he "knew we would get caught" *Fontenot*, 881 P.2d at 78 (N/T 6/8/1988, 145-

---

[13] While Petitioner's confession contained some false information, such as the exact manner of death or Mr. Titsworth's involvement, the Court's analysis failed to recognize how such false information could be *probative* of Petitioner's guilt. *See McElmurry v. State*, 60 P.3d 4, 19 (Okla. Crim. App. 2002) ("Such a lie, designed to conceal guilt, may on occasion be more convincing evidence of guilt than truthful admissions.").

146; N/T 6/10/1988, 205).  Clearly, such admissions tended to disprove Petitioner's claims that he was "fed" the information in his confessions.

Further, the Court clearly erred by determining that Petitioner's confession was not corroborated.  In fact, the OCCA found just the opposite, as Respondent repeatedly pointed out in his motion to dismiss.  *Fontenot*, 881 P.2d at 78-79.  A state prisoner seeking federal habeas relief based upon alleged erroneous factual determinations must overcome by clear and convincing evidence the presumption afforded such state court factual findings.  28 U.S.C. § 2254(e)(1); *Hamilton*, 436 F.3d at 1186.  But, without so much as acknowledging the OCCA's holding on direct appeal, which should have been a formidable obstacle to obtaining habeas relief, the Court instead found "numerous and substantial indicia of unreliability . . . ." (ROA, Vol.XXXI, 1002).  *But see Cullen*, 563 U.S. at 181-182.

The Court's failure to accord AEDPA deference to the foregoing factual findings of the OCCA had a domino effect on its treatment of the other claims raised in the petition.  Having found that the confession was involuntary and uncorroborated without showing how the OCCA's findings to the contrary were overcome by clear and convincing evidence, the Opinion and Order even went so far as to hold that the evidence presented at Petitioner's re-trial was insufficient to sustain Petitioner's guilt pursuant to *Jackson v. Virginia*, 443 U.S. 307 (1979) (ROA, Vol.XXXI, 1021-1022).  This decision was again directly contrary to the

OCCA's holding that the evidence was sufficient, without acknowledging that holding.[14]  Based on the Court's failure to accord deference to those factors which corroborated the confession, this Court can have no confidence that the District Court actually considered the content of Petitioner's confession in making that extreme determination, as it was required to do under *McDaniel v. Brown*, 558 U.S. 120, 131 (2010) (reasoning that to "make the analogy complete" between a reversal for insufficiency of the evidence and the trial court's granting a judgment of acquittal, "a reviewing court must consider all of the evidence admitted by the trial court," regardless of whether that evidence was admitted erroneously (quoting *Lockhart v. Nelson*, 488 U.S. 33, 41-42 (1988))).  Instead, the Court appears to have relied, once again, on its finding of actual innocence, which was based on later-produced evidence.  *But see Cullen*, 563 U.S. at 181-182.

The district court also went on to hold that both trial counsel and appellate counsel rendered ineffective assistance of counsel within the meaning of *Strickland v. Washington*, 466 U.S. 668 (1984).  In *Strickland*, the United States Supreme Court held that in order for a defendant to prevail on a claim of ineffective assistance of counsel, defendant must identify "acts or omissions [which] show

---

[14] The Opinion and Order also found the State failed to prove the *corpus delicti* of the crime.  However, the *corpus delicti* rule was a state law rule (not a constitutional requirement), and it was specifically *discarded* in the very opinion under review. *Fontenot*, 881 P.2d at 80.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (recognizing "[a] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus").

that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 690. Even if errors are identified, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, 466 U.S. at 694.

Again, the District Court completely ignored the OCCA's opinion on direct appeal, which considered and rejected a claim that trial counsel failed to investigate issues central to the case and failed to use available evidence. Notably, the OCCA reasoned, "Ward's retrial occurred one year after Fontenot's. We cannot even determine whether, at the time of Fontenot's retrial, his defense attorney had access to or knowledge of these witnesses, or whether he would have considered the presentation of their testimony wise defense strategy." *Fontenot*, 881 P.2d at 85-86.

While the issues raised on collateral review are similar, arguably, some of Petitioner's ineffective assistance of counsel claims were not raised on direct appeal. But even on *de novo* review, the District Court should have held these claims failed. The Court held that counsel should have attempted to present Ward's testimony at the retrial, based on Ward's statement that he was present at the gas station and Petitioner was not. The Court accepted this argument

notwithstanding the fact Petitioner's first conviction was overturned for an error under *Bruton v. United States*, 391 U.S. 123 (1968) due to the way the co-defendants' statements were used against each other, and notwithstanding the likely unavailability of Mr. Ward at Petitioner's re-trial due to Ward's right against self-incrimination. Even if such testimony could have somehow been admitted, the Opinion fails to acknowledge how Ward's placing himself at the scene would have *corroborated* Petitioner's confession (and eyewitness testimony) in a key way in spite of Ward's denials concerning Petitioner.

The Court also found that counsel neglected to investigate evidence showing Haraway was stalked and failed to impeach numerous State's witnesses about their inconsistent statements. However, under a proper *Strickland* analysis, Petitioner has failed to show a reasonable probability of a different outcome at trial based on any of these alleged failings. *Strickland*, 466 U.S. at 694. Moreover, it appears that trial counsel did at least investigate evidence the victim was being stalked but may have concluded it was too speculative to use at trial (ROA, Vol.II, 260). *See Delozier v. Sirmons*, 531 F.3d 1306, 1326 (10th Cir. 2008) ("This court has repeatedly stated that 'counsel's decisions regarding how best to cross-examine witnesses presumptively arise from sound trial strategy.'" (internal citation omitted)); *Romano v. Gibson*, 278 F.3d 1145, 1154 (10th Cir. 2002) ("'There are countless ways to provide effective assistance in any given case[,]' and '[e]ven the

best criminal defense attorneys would not defend a particular client in the same way.'" (citing *Strickland*, 466 U.S. at 689)).

The Court also found that Petitioner was denied a fair trial due to police misconduct including a lack of training, improper evidence collection at the scene of the crime, and improper interview techniques (ROA, Vol.XXXI, 1030-1044). Undoubtedly, this was not a perfect investigation, and certain things might be done differently today than in 1984.  Again, however, Petitioner has not shown a reasonable probability of a different outcome at trial within the meaning of either *Brady* or *Strickland* in light of the fact that his confession to murder actually was corroborated.

Ultimately, therefore, the discussion should return to the proper standard of review because the proper standard focuses not on the District Court's *errors*, but on the OCCA's *decision* including its factual determinations.  Therefore, even if this Court should find that the Court properly reached the merits of Petitioner's time-barred, procedurally barred, and in some instances, unexhausted claims, this Court should hold that the decision of the OCCA on direct appeal finding that the confession was corroborated in nine separate ways, and therefore, that there was sufficient evidence to sustain the judgment, and that trial counsel was not ineffective, is neither contrary to, nor an unreasonable application of, federal law, nor an unreasonable determination of the facts in light of the state court record.  28

U.S.C. § 2254(d)(1-2).  To the extent that *de novo* review of Petitioner's ineffective assistance of trial counsel and appellate counsel claims, or Petitioner's claims concerning an alleged lack of training, alleged improper evidence collection, and alleged improper interview techniques is conducted, Petitioner failed to show a reasonable probability of a different outcome at trial in light of his confession, which was corroborated in nine compelling ways.

## CONCLUSION

The second amended petition was time-barred and procedurally barred, and also contained unexhausted claims, and therefore, the District Court erred when it applied equitable tolling to reach the merits of Petitioner's ancient claims. Therefore, the Opinion should be reversed and the second amended petition dismissed.  Alternatively, this case should be remanded with instructions to allow Respondent to respond to the merits of the petition, applying AEDPA to claims decided on the merits in state court and giving deference to state court findings of fact whenever *de novo* review is applicable.

## STATEMENT OF ORAL ARGUMENT

Given the multiple legal and factual issues presented in this appeal, it is believed that oral argument would materially assist the Court in making its decision.

Respectfully submitted,

**MIKE HUNTER**
**ATTORNEY GENERAL OF OKLAHOMA**

**s/ MATTHEW D. HAIRE**
**MATTHEW D. HAIRE, OBA# 14916**
**ASSISTANT ATTORNEY GENERAL**
313 NE 21st Street
Oklahoma City, Oklahoma 73105
(405) 521-3921
(405) 522-4534 (FAX)
**Service email: fhc.docket@oag.ok.gov**

**s/ THEODORE M . PEEPER**
**THEODORE M. PEEPER, OBA# 19909**
**ASSISTANT ATTORNEY GENERAL**
313 NE 21st Street
Oklahoma City, Oklahoma 73105
(405) 521-3921
(405) 522-4534 (FAX)
**Service email: fhc.docket@oag.ok.gov**

**Attorneys for Respondent-Appellant**

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS AND TYPEFACE REQUIREMENTS

1.    This document complies with the word limit of Fed. R. App. P. 27(d)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains <u>12, 912</u> words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using WordPerfect 12 in Times New Roman 14-point type.

<u>s/ MATTHEW D. HAIRE</u>
<u>s/ THEODORE M. PEEPER</u>

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was electronically filed  with the Clerk of this Court on December 31, 2019, and for electronic transmission to:

Tiffany R. Murphy

<u>s/MATTHEW D. HAIRE</u>
<u>s/ THEODORE M. PEEPER</u>

## <u>CERTIFICATE OF DIGITAL SUBMISSIONS</u>

This is to certify that:

1.　　All required redactions have been made and, with the exception of those redactions, every document submitted in Digital Form or scanned PDF format is an exact copy of the document filed with the Clerk;

2.　　The digital submissions have been scanned for viruses with Symantec Endpoint Protection, Updated 12/31/19, and according to said program, are free of viruses.

<u>s/ MATTHEW D. HAIRE</u>
<u>s/ THEODORE M. PEEPER</u>